IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JEFFREY JOSEPH PURSELL, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN W. COLVIN, Acting ) <br> Commissioner of Social Security,[1] ) <br> ) <br> Defendant. ) | No. 12 CV 5455 <br><br> Honorable Michael T. Mason |

## MEMORANDUM OPINION AND ORDER

Michael T. Mason, United States Magistrate Judge:

Claimant Jeffrey Joseph Pursell ("Pursell" or "claimant") has filed a motion for summary judgment [12] seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner"). The Commissioner denied Pursell's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 416(i), 423(d), and 1382c(a)(3)(A). The Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, Pursell's motion for summary judgment [12] is granted in part and denied in part, and the case is remanded for further proceedings consistent with this opinion.

I. **PROCEDURAL HISTORY**

Pursell filed an application for DIB and SSI on May 24, 2010. (R. 195-201, 202-06.) He alleges that he has been disabled since May 11, 2010, due to strokes. His

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as defendant in this suit.

application was denied initially and on reconsideration. (R. 85-88, 99-101.) He was 35 years old on the alleged onset date. Pursell sought and had a hearing before an Administrative Law Judge ("ALJ") on July 6, 2011. (R. 107, 13-63.) Pursell (represented by counsel), his wife, and vocational expert ("VE") Matthew Lampley testified at that hearing. On July 27, 2011, ALJ Patricia Witkowski Supergan issued a written decision denying claimant's benefits. (R. 71-79.) The Appeals Council denied claimant's request for review on May 26, 2012 (R. 1-3), and claimant filed a timely appeal to this Court. The parties have consented to our jurisdiction pursuant to 28 U.S.C. § 636(c) [7].

## II. FACTUAL BACKGROUND

### A. Medical Evidence

The earliest medical records in the file provided to this Court date from October 2008. At that time, Pursell complained of right-sided numbness and tingling in his face, arm, and leg. (R. 418-19.) Upon referral from neurologist Surendra Gulati, MD, Pursell saw Karla Shively, MD, both of Provena Saint Joseph Medical Center ("St. Joseph's"). (*Id.*) A bilateral lower extremity venous duplex scan was performed. (R. 370.) The medical report showed that claimant had extensive varicosities bilaterally with reflux but no blood clots. (*Id.*) A CT scan of claimant's brain was also conducted and revealed a "tiny old lacunar infraction similar to the other infraction found in earlier CT scan in 2006." (R. 372.) Pursell was discharged on October 15, 2008 and was to follow up with a MRI scan. (R. 413.) On October 16, 2008, claimant had the MRI, which revealed the same "small acute lacunar infract" spotted in the previous CT scan. (R. 374.) An orbital x-ray revealed no metallic fragments. (R. 375.)

2

Claimant returned to St. Joseph's on November 12, 2008, for a unilateral duplex venous scan of his lower extremities. (R. 368.) That scan revealed reflux in the greater saphenous vein at the origin of the groin area. (*Id.*) On November 22, Pursell had a bilateral duplex venous scan that revealed the right saphenous vein to be incompetent with reflux and venous insufficiency at the saphenofemoral junction. (R. 367.)

On December 12, 2008, upon Dr. Gulati's referral, Pursell was evaluated in the Department of Neurology at the Mayo Clinic in Rochester, Minnesota for strokes and fecal urge incontinence. (R. 770-74.) That Clinic's report summarizes Pursell's stroke history and, among other things, notes that when he had a "spell" of "intermittent distorted and blurred vision" in October 2008, Pursell called his wife and told her to get his cane on their way to the local hospital. (R. 774.) The Clinic's "plan" suggested Pursell undergo, among other things, a colonoscopy, as well as a CT scan of his small bowel and anorectal manometry. (R. 773.) It is unclear from the record whether claimant followed through with those examinations. The Mayo Clinic's report noted, among other things, a "question of recurrent cerebral infarcts," and that Pursell reported he has smoked "1-1/2 to 2 packs per day since age 12 and is currently using a stepdown program using special cigarettes." (R. 772.)

On February 16, 2009, St. Joseph's emergency room admitted Pursell for "transient ischemic attack ['TIA'] like symptoms." (R. 396; *see also* 408-09.) He reported feeling dizzy and lightheaded on his way to work. (R. 408.) Claimant had a CT scan that revealed the same lacunar infarct as the prior CT and MRI scans. (R. 396.) St. Joseph's advised Pursell to lose weight, quit smoking, and follow-up with physical therapy for his left hand. (R. 396, 408.)

3

On February 27, 2009, Pursell had a physical therapy assessment at Ottawa Regional Hospital and Healthcare Center. (R. 398-403.) The problems listed included difficulty with left hand grasp and left hand fine motor control. (R. 400.) The "interdisciplinary rehabilitation care plan" recommended occupational therapy three times per week for three weeks. (R. 398.)

On January 2, 2010, claimant was treated again at St. Joseph's emergency room. (R. 423-24.) He had originally gone to Quick Care for redness and swelling in his right leg, but following a return visit to Quick Care when his condition worsened, he was admitted to St. Joseph's. (R. 423.) These records indicate reports of "tobacco abuse." (R. 434.) Following various testing, antibiotic therapy, and other treatments at St. Joseph's, claimant was discharged on January 5 with prescriptions and a directive to follow up with Dr. Shively. (R. 434.)

On January 13, 2010, Pursell saw Gary Trager, MD, at Family Medical Group, as a follow up to his recent hospitalization. (R. 451-52.) Among other things, claimant reported he had "[s]topped using cigarettes recently." (R. 451.)

On March 24, 2010, claimant went to Physicians Immediate Care because he had passed out while coughing and hit his head on the ground. (R. 503-06.) A physical examination revealed he had an abrasion on the right side of his forehead above his right eye. (R. 504.) Pursell received a "certificate to return to work" with "no restrictions." (R. 506.)

Pursell followed up with Dr. Shively on March 30, 2010. (R. 455-56.) He reported feeling much better and that he had "[s]topped using cigarettes recently." (R. 455.) Dr. Shively told him to return in 6 months, or sooner as needed. (R. 456.)

4

On May 11, 2010, claimant was treated again at St. Joseph's for right facial and right arm tingling. (R. 555-56.) Dr. Gulati noted that Pursell told the ER nurse that he smokes one pack of cigarettes a day, but that Pursell told him that he smokes one-half pack of non-nicotine cigarettes every three days, and wrote: "I do not know which one is right." (R. 555.) A CT scan showed an "old right lacunar infract," and Pursell's chest x-ray was unremarkable. (R. 557; see also R. 561, 564-65; R. 563.) Dr. Shively's note dated May 13, 2010 stated "[t]he patient may return to work without any restrictions." (R. 570.)

On July 19, 2010, Sumanta Mitra, MD, a state medical consultant, attempted to complete an "Illinois Request for Medical Advice" report regarding Pursell. (R. 591-93.) Dr. Mitra noted, however, that Pursell refused to supply a description of his activities of daily living ("ADLs"), that he indicated "he was not interested in continuing with his claim for disability as he intended to return to work," and that he "indicated that a decision can be made based on the evidence in file." (R. 593.) Dr. Mitra concluded that "[w]ithout ADLs, there is insufficient evidence to determine the degree of his impairment." (Id.)

On November 10, 2010, Pursell completed a function report, with the assistance of his wife. (R. 259-69.) He reported that he had had "four strokes, three mini strokes + a few episodes of passing out," that he also suffers "from occational dizzy spells + unsteadiness," and that "any one of these symptoms can occur with out warning [sic]." (R. 259.) Among other things, claimant wrote that he helps his wife get their children ready for school, runs any errands and tidies their home, then relaxes until his family gets home, then helps with school work and preparing dinner. (R. 260.) He indicated that while he does laundry, dishes, sweeping, mowing, and yard work, these tasks take

5

extra time because he needs breaks. (R. 261.) He also described limitations in his lifting, squatting, bending, standing, walking, hearing, and memory abilities, among others. (R. 264.) He also reported use of a cane, which he said was prescribed in 2002, and that he used it "ralley now only when balance is off or weak [sic]." (R. 265.)

On December 4, 2010, state medical consultant Peter Sorokin, MD, completed an Internal Medicine Consultative Examination Report regarding Pursell. (R. 729-33.) Dr. Sorokin wrote that claimant had reported that he "has smoked a half a pack of cigarettes a day for the last 24 years." (R. 730.) Dr. Sorokin found, among other things, that Pursell had normal abilities to grasp and manipulate objects, and had no limited ranges of motion in the shoulders, elbows, wrists, hips, knees, ankles, or cervical and lumbar spine. (R. 731.) A straight leg raise test supine and seated was negative bilaterally. (*Id.*) Dr. Sorokin also reported that Pursell's neurologic and mental status examinations were normal. (*Id.*)

On January 7, 2011, Mark Langgut, Ph.D., completed a psychological assessment of Pursell at the request of the Illinois Department of Human Services. (R. 735-39.) Among other things, Dr. Langgut interviewed claimant and reviewed Dr. Sorokin's report. (*See* R. 736.) Dr. Langgut noted that Pursell stood 6'3" tall and weighed 360 pounds. (R. 738.) Dr. Langgut's report noted that claimant suffers from hypertension, high cholesterol, obesity, type I diabetes, had had several strokes, and that "[c]urrently he smokes one and a half to two packs of cigarettes daily." (R. 737.) Pursell also reported "some increase in emotional volatility since his CVA's [cerebrovascular accidents]," although "he has been able to inhibit these expressions of late." (R. 738.) Dr. Langgut's "Diagnostic Considerations" included "Axis I Mood

Disorder following CVA," and "Axis III Cerebrovascular Accident, Transient Ischemic Attack [and] Neuropathy." (R. 739.)

On January 24, 2011, state medical consultant Phyllis Brister, Ph.D., reviewed Dr. Langgut's report and Pursell's November 2010 ADL report, and completed a Psychiatric Review Technique of Pursell. (R. 740-52.) Dr. Brister found that claimant had "MOOD DISORDER POST CVA" but concluded that impairment was "not severe." (R. 752, 740.) Among other things, she noted that Pursell's ADLs "were consistent with evidence and credible." (R. 752.) She also noted that Pursell had "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty." (R. 740.)

On January 26, 2011, state medical consultant Michael Nenabar, MD, completed an "Illinois Request for Medical Advice" report regarding Pursell. (R. 754-56.) Dr. Nenabar noted a "primary diagnosis" of "history of strokes" and a "secondary diagnosis" of "syncope of unknown cause." (*Id.*) After reviewing a "[r]ecent physical CE" that showed "all normal or WNL [within normal limits] findings," Dr. Nenabar concluded claimant "is not restricted," is "without limitations," and that "[h]is impairments are not severe." (R. 756.)

On March 10, 2011, upon referral from Dr. Shively, Ming Hung, MD, of Midwest Rehabilitation Associates, conducted a physical examination of Pursell. (R. 765-66.) Following that first office visit, Dr. Hung's report listed "impressions" of "mobility and functional impairment secondary to underlying prior [CVA] with residual left hemiparesis," "recurrent [TIAs] with cognitive impairment," obesity, diabetes mellitus, sleep apnea, and hypertension. (R. 766.) His report also noted as "recommendations":

7

> In regard to work at this time, it would be prudent to restrict the patient to part-time basis only, about 4 hours each day and up to 3 days a week along with work environment in a structured setting with minimal external distraction. He would also require flexibily for downtime about every 1-2 hours. The patient also is not to carry in excess of 10 pounds and also not to negotiate ladders [sic].

(*Id.*) Dr. Hung recommended additional outpatient therapy, a more in-depth neuropsychological evaluation "to better determine the patient's baseline cognitive function as well as deficit area," and a weight loss management program. (*Id.*) He directed Pursell to return to his office in four to six weeks. (*Id.*)

On March 21 and 29, 2011, upon Dr. Hung's referral, Pursell saw Michael Gelbort, Ph.D., a clinical psychologist, who prepared a Neuropsychological Evaluation report. (R. 758-61.) Dr. Gelbort's report notes that Pursell arrived using a single point cane, which Pursell reported he used on occasion. (R. 758.) Dr. Gelbort administered "a battery" of cognitive tests and ultimately concluded, among other things, that "[o]verall Mr. Pursell is demonstrating a pattern consistent with acquire neurological deficits which affect verbal information processing to some degree and visual spatial abilities to a greater level of impairment [sic]." (R. 760.) Dr. Gelbort noted that Pursell "certainly should not be operating a commercial vehicle," and that he should not even operate a family car "as his visual processing is compromised and his visual processing speeds are notably impaired." (*Id.*) Dr. Gelbort's report concluded: "His showing significant cognitive limitations which appear to be stable in light of the amount of time that has transpired since his neurological events. He may be able to work in some various specific and supervised capacity but does not appear to be competitive in the regular workforce [sic]." (*Id.*)

On April 24 and June 2, 2011, Pursell returned to Dr. Hung for additional physical examinations. (R. 764, 763.) Dr. Hung's April notes state, among other things, that claimant "ambulates for me in the office without any assistive device and maintained good toe clearance, good knee stability, good base support. Standing balance for tiptoe as well as heel is noted to be poor plus to fair minus. The patient was able to perform tandem walking but has had some loss of balance," "is able to answer questions, following commands. Full range of motion throughout." (R. 764.) Dr. Hung recommended additional outpatient speech and physical therapy "to upgrade [Pursell's] high level balance, endurance level, work conditioning as well as have speech therapy follow up for cognitive retraining." (*Id.*)

On June 2, 2011, Dr. Hung noted, among other things, that Pursell "was able to ambulate for me without any assistive devices with mild loss of balance with rapid arms," and "had difficulty staying on heels and tiptoe," as well as "some difficulty with tandem walking" but "no falls." (R. 763.) Dr. Hung also noted that Pursell "did not follow through with previous neuropsychiatric screening due to lack of insurance coverage with the neuropsychologist," but indicated Pursell intended to have his attorney contact the "neuropsychologist." (*Id.*) Dr. Hung again recommended outpatient therapy with a focus on upgrading Pursell's high-level balance issues and to further improve his overall safety. (*Id.*)

On June 16, 2011, Pursell returned to Dr. Gelbort's office for administration of the Wechsler Adult Intelligence Scale-III test. (R. 767.) Dr. Gelbort's letter regarding that test stated simply: "Intellectual assessment found a Verbal IQ of 79, a Performance IQ of 77, and this resulted in a Full Scale IQ of 76." (*Id.*)

9

### B. Claimant's Hearing Testimony

Pursell testified before the ALJ at the July 6, 2011 hearing. (R. 19-37.) He stated that he stopped working because of "problems with my strokes," though he noted that he was terminated from his last job driving a spotter truck because he had an accident at work. (R. 19, 25.) He recollected having a total of four strokes, and then three TIAs or "mini strokes." (R. 25.) He stated that he was collecting unemployment prior to and at the time of the hearing. (R. 19, 22, 29.) When asked why he was collecting unemployment, he responded: "I'm collecting unemployment because from when I was let go of my job, and in the meantime, since I'm pursing Social Security, I just figure to have some type of an income coming in, so I'm not affecting my, you know, any income. I'm just periodically looking for the jobs with unemployment [sic]." (R. 29.)

Claimant testified he had been married to Amy Pursell for 11 years and that they have three young daughters. (R. 20.) At one point, Pursell held a Commercial Driver's license, but he testified that he could not renew it because he failed the computer test. (R. 20-21.) Pursell testified that he has a hard time remembering things, difficulty speaking, and difficulty maintaining his balance, particularly when using the stairs and carrying objects. (R. 27, 28-29.) He also testified that he gets "little dizzy spells" if he "bends down or something too fast." (R. 29.) He stated that before his strokes, he did a lot of major cleaning around the house, but now, his wife and children do most of the household chores and yard work. (R. 23.) He testified that he had not been advised against driving (R. 24), but that he tends to avoid driving in unfamiliar areas "for my safety, and my family's safety." (R. 35.) Pursell stated that he spends most of his time during the day sitting, taking naps, and occasionally watching television. (R. 32.) He

10

also stated that he smokes cigarettes, but "[j]ust like one here or there, just like for calming of my nerves if I get stressed out." (R. 21.) He testified that the Mayo Clinic could not determine the cause of his strokes. (R. 37.)

### C. Amy Pursell's Hearing Testimony

Claimant's wife, Amy Pursell, also testified at the July 2011 hearing. (R. 38-50.) She stated that she works full-time as a special needs aid at a high school. (R. 38, 43.) She confirmed that the Mayo Clinic failed to identify any cause for claimant's strokes. (R. 38.) She testified that her husband was fired from his last job for "reckless driving," but noted "they're currently investigating that because there were people who were in more accidents, and still kept their job, so we're thinking he might have gotten fired for missing too much work, and for being sick a lot." (R. 39.) She also stated that claimant had strokes and TIAs while working. (R. 40.)

Mrs. Pursell testified that claimant has short-term memory problems, and has difficulty making judgments and simple decisions. (R. 40-41.) She also testified that her husband has "extreme anger issues," specifically, that he has "temper tantrums like a little kid." (R. 43.) She reported that claimant was "pretty active in his job" up until the summer of 2010, but has since become "pretty sedentary" and "takes a lot of naps," possibly due to his sleep apnea. (R. 49, 44.) She also stated that her husband does drive, but only in familiar areas, as he becomes anxious and overwhelmed when driving in an unfamiliar area. (R. 44-45.) She testified that she takes care of the household finances and other duties, with help from her eldest child, because those things are too difficult for claimant to do. (R. 45-47.)

When asked by the ALJ why her husband is collecting unemployment when he

can't work, Mrs. Pursell responded: "I don't know. It seems like the only thing to do at this point," and confirmed that's the case "[b]ecause of money." (R. 48.) When asked if she and her husband were "desperate" for money, she responded: "Well, I make $9.25 an hour. We're not racking it in.... We have a mortgage, we have three kids [sic]." (*Id.*)

### D.  Vocational Expert's Hearing Testimony

VE Matthew Lampley also testified at the July 2011 hearing. (R. 51-61.) He classified Pursell's past work as an industrial truck operator, hostler driver, and heavy truck driver, each with a medium exertional level. (R. 52-53.) The VE testified that an individual with Pursell's age, education (high school diploma), and work experience, with a residual functional capacity ("RFC") to perform medium work, who could frequently climb ramps and stairs, but never ladders, ropes, or scaffolds, and who would need to avoid all exposure to hazards such as moving machinery, could not perform Pursell's past work. (R. 53.) However, the VE testified that other jobs would remain available to such an individual, such as furniture cleaner (600 jobs in Illinois), laundry laborer (1,400), and kitchen helper (14,000). (*Id.*)

When asked by the ALJ to assume an individual of claimant's age, education, and work experience, but with a RFC to perform light work, who could frequently climb ramps and stairs, but never ladders, ropes, or scaffolds, who could frequently balance, stoop, kneel, crouch and crawl, but would need to avoid all exposure to extreme cold and heat, wetness, humidity, and hazards such as moving machinery, and who could perform simple, repetitive, and routine tasks, the VE listed the following available jobs: small parts cleaner (1,500 jobs in Illinois), bench assembler (3,700), and electrical assembler (2,900). (R. 53-55.) When asked to restrict that hypothetical individual to a

sedentary exertional level, the VE cited the jobs of final assembler (2,200 jobs in Illinois), table worker (700), and bench hand (600). (R. 55.)

When asked to limit the hypothetical individual to a "low stress work environment," which the ALJ described as "occasional decision making and changes in work setting, and no strict production quotas," the VE appeared to indicate that the identified jobs would be eliminated. (R. 56-57.)

When asked by Pursell's attorney what jobs would be available to someone of claimant's age, education, and work experience, who is unable to make judgments, simple work-related decisions, or to understand and remember complex instructions, who is limited to routine levels of work-related stress, and who is off-task 30 percent of a 6 to 8 hour work day, the VE testified that all competitive employment would be precluded for such an individual. (R. 57.) When asked about jobs available to an individual of claimant's age, education, and work experience, who needs assistance climbing stairs frequently and carrying objects, the VE testified that some jobs would remain within the light category, but not the sedentary ones. (R. 58-59.)

## III. LEGAL STANDARD

### A. Standard of Review

This Court must affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is "more than a mere scintilla of proof." *Kepple v. Massanari*, 268 F.3d 513, 516 (7th Cir. 2001). It means "evidence a reasonable person would accept as adequate to support the decision." *Murphy v. Astrue*, 496 F.3d 630, 633 (7th Cir. 2007); *see also Diaz v. Chater*, 55 F.3d 300, 305

(7th Cir. 1995) (substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation and quotations omitted). In determining whether there is substantial evidence, the Court reviews the entire record. *Kepple*, 268 F.3d at 516. However, our review is deferential. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). We will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)).

Nonetheless, if, after a "critical review of the evidence," the ALJ's decision "lacks evidentiary support or an adequate discussion of the issues," this Court will not affirm it. *Lopez*, 336 F.3d at 539. While the ALJ need not discuss every piece of evidence in the record, he "must build an accurate and logical bridge from the evidence to her conclusion." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Further, the ALJ "may not select and discuss only that evidence that favors his ultimate conclusion," *Diaz*, 55 F.3d at 308, but "must confront the evidence that does not support his conclusion and explain why it was rejected." *Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004). Ultimately, the ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of [his] reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (*per curiam*) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

**B.    Analysis under the Social Security Act**

To qualify for disability insurance benefits, a claimant must be "disabled" under the Social Security Act (the "Act"). A person is disabled under the Act if "he or she has

an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon*, 270 F.3d at 1176. The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-85 (7th Cir. 2001). If the claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis. At step one, the ALJ found that Pursell was not and had not been engaged in substantial gainful activity since May 11, 2010, the alleged onset date. (R. 73.) At step two, she found Pursell had the "following severe impairments: status post cerebrovascular accident & transient ischemic attacks; obesity." (*Id.*) At step three, the ALJ found that Pursell's impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "Listings"). (R. 74.) At step four, the ALJ found that Pursell has the RFC to perform light work, "except that he can frequently climb ramps and stairs but never ladders, ropes or scaffolds," can "frequently balance, stoop, kneel, crouch and crawl," "must avoid all exposure to extreme cold and heat, wetness, humidity and

15

hazards such as moving machinery or unprotected heights," and "is limited to work involving simple, routine and repetitive tasks that could be learned in thirty days or by demonstration." (R. 74.) At step five, while the ALJ found that Pursell is unable to perform any past relevant work, she concluded that jobs exist in significant numbers in the national economy that Pursell can perform. (R. 78-79.)

Claimant now argues before this Court that the ALJ erred, among other things, in not giving any weight to the treating medical source opinions of Drs. Hung and Gelbort; by not considering all limitations on Pursell's RFC that "limit his ability to work at any capacity" (asserting "in essence this is a credibility issue"); by failing to adequately evaluate the combined effects of Pursell's obesity with his musculoskeletal and respiratory impairments in determining his RFC; in failing to use the "special technique" to evaluate Pursell's mental impairments; and in concluding that Pursell did not meet or equal Listing 11.04. We address the issues as appropriate below.

## IV. ANALYSIS

### A. The ALJ Erred in Evaluating Claimant's Credibility

Because the ALJ is in a superior position to judge credibility, her credibility determination is entitled to "special deference." *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004) (citation omitted). However, the ALJ is still required to articulate her reasoning and discuss or distinguish relevant contrary evidence. *Clifford*, 227 F.3d at 870. Additionally, the ALJ must follow the requirements of Social Security Ruling ("SSR") 96-7p. Whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms of the underlying impairment are not substantiated by objective medical evidence, the ALJ must make a finding on the

16

credibility of the statements based on a consideration of the entire case record. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). SSR 96-7p also provides that an ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." 1996 WL 374186, at *2. We conclude that the ALJ's evaluation of Pursell's credibility fails to pass muster for several reasons.

First, the ALJ's failure to properly consider the issue of (in)frequency of treatment warrants remand. The ALJ repeatedly stated that Pursell's "relatively minimal" or "lack" of treatment following the alleged onset date did not provide strong support for his alleged disabling conditions, and concluded that his statements regarding his symptoms were not credible to the extent they were inconsistent with the ALJ's determination of his RFC. (R. 77, 75; *see also* R. 76.) However, the ALJ failed to comply with SSR 96-7p in relying on that treatment history as support for her conclusions. SSR 96-7p states, in relevant part:

> [T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.

SSR 96-7p, 1996 WL 374186, at *7; *accord Ellis v. Barnhart*, 384 F. Supp. 2d 1195, 1203 (N.D. Ill. 2005) ("[T]he ALJ could rely on [claimant's] non-compliance as long as he

17

had first considered [claimant's] explanations for her non-compliance.").

Here, the ALJ failed to conduct any investigation of any reasons for the infrequency of Pursell's treatment. At the hearing, the ALJ did not question claimant or his wife to determine whether there were good reasons for claimant's failure to seek medical treatment, consistently or otherwise. Without doing so, the ALJ was "not entitled to infer that his failure to follow through ... shows that [claimant's] pain was less serious than he described." *Newell v. Astrue*, 869 F. Supp. 2d 875, 888 (N.D. Ill. 2012). Further, the ALJ failed to address record evidence that might explain claimant's lack of consistent medical treatment. For example, on June 12, 2011, Dr. Hung noted "the patient did not follow through with previous neuropsychiatric screening due to lack of insurance coverage with the neuropsychologist." (R. 763.)

Second, the ALJ found that Pursell's collection of unemployment benefits suggested that his allegations regarding the severity of his symptoms "are not fully credible," but failed to consider the totality of circumstances in doing so. (R. 77.) As the ALJ noted, applicants for unemployment benefits must affirm that they are ready, able, and willing to work. (*Id.*) And while the Seventh Circuit has noted that a claimant's representations in seeking unemployment benefits may be relevant in assessing her subjective complaints of disability, *Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005), that court has also stated that "[a] desperate person might force herself to work – or in this case, certify that she is able to work – but that does not necessarily mean she is not disabled." *Richards v. Astrue*, 370 Fed. Appx. 727, 731 (7th Cir. Apr. 13, 2010). Instead, the ALJ "should look at the totality of circumstances in deciding the significance of an application for unemployment benefits." *Robinson v. Astrue*, No. 11-1591, 2013